Robert Randall LONG, Appellant

v.

The STATE of Texas, Appellee

NO. 14–16–00149–CR

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed April 18, 2017

Discretionary Review Refused
September 13, 2017

354

Jessica Alane Caird, Houston, TX, for State.

Kenneth E. Goode, Houston, TX, for Appellant.

Panel consists of Justices Busby, Brown, and Jewell.

**OPINION**

Marc W. Brown, Justice

Appellant Robert Randall Long was indicted for theft of property from multiple complainants, with a total value over $200,000, pursuant to one scheme and continuing course of conduct, beginning about March 1, 2008, and continuing through January 31, 2009. *See* Tex. Penal Code §§ 31.03, 31.09 (West 2015). The jury returned a guilty verdict and assessed appellant's punishment at confinement for life. Appellant challenges his conviction in five issues. First, appellant contends the evidence was legally insufficient because it failed to show that he personally engaged in the criminal scheme and course of conduct. Second, appellant asserts that he suffered egregious harm from the trial court's erroneous inclusion of a circumstantial-evidence instruction in the jury charge. In his next two issues, appellant argues that the trial court erred in denying his motions to suppress evidence from two searches where (1) a search warrant was not supported by probable cause and (2) he did not voluntarily provide consent. Finally, appellant contends that the trial court abused its discretion in refusing to permit him to represent himself at trial. We affirm.

## I. BACKGROUND

Appellant was charged by indictment with the felony offense of theft of property with a total value over $200,000. As alleged in the indictment, "pursuant to one scheme and continuing course of conduct," appellant unlawfully appropriated, by acquiring and exercising control over property, namely, money, owned by multiple named complainants with the intent to deprive those complainants of that property, which had a total value over $200,000. The conduct was alleged to have occurred beginning on or about March 1, 2008, and continuing through January 31, 2009.

At trial, the State presented evidence of appellant's scheme during this timeframe

from multiple victims. Matt Berkebill with Advanced Welding in Arkansas testified that a Harold Lucas with ExxonMobil Canada contacted him by email about an emergency welding project. Berkebill accepted the job with the condition that Advanced had to use "Inconel 6003578" wire. Advanced received a purchase order signed by Lucas. After Berkebill was unable to find a supplier for the wire, Lucas said the wire was "exclusive to Exxon[ ]Mobil" and had to be ordered from supplier B and L Materials, located in Tomball, Texas. Berkebill communicated with a Norma Williamson with B and L. Even though suppliers generally permit credit, B and L insisted on cash payment. Advanced borrowed money, and one of its employees drove a cashier's check for $28,600 to Tomball. Advanced purchased the specialized wire at $52 per pound, but instead received ordinary carbon welding wire that normally costs $2 per pound. Berkebill sought a refund for the wire, but B and L did not answer the phone or return emails. Advanced did not receive the ExxonMobil Canada job and never used the wire.

Manuel Camarena with Barber Welding & Manufacturing in California received emails from a Harold Lucas and a Tony Dunn with ExxonMobil Canada. Camarena agreed to clad three heat exchanger heads. Lucas insisted that Barber Welding use "IN6003578" wire for the job. After Camarena failed to locate this wire, Lucas informed him that B and L was the exclusive supplier. Camarena communicated with a Norma Williamson with B and L. After receiving a purchase order signed by Lucas, Barber Welding ordered the "IN6003578" wire at $58 to $60 per pound. Instead of the usual 30 days to pay, Barber Welding had to pre-pay. Barber Welding sent a $9,533.78 company check to B and L, and B and L shipped the wire. The wire had a tag claiming it was "IN6003578" from the Inconel 600 series, but instead the wire was basic carbon steel wire suitable for jobs done with wire costing less than $5 per pound. Barber Welding never received any work from ExxonMobil Canada.

Brian Miller with Bench Industries in Montana received emails from a Tony Dunn with ExxonMobil Canada asking if Bench could perform a job to "hard-surface" filters. Dunn told Miller that he had to speak to Robert Long with "RLC" "because he had the proprietary on the powder that [Miller] had to purchase from B and L" in Tomball. Bench received a purchase order signed by Dunn. Because B and L did not permit credit, Bench paid B and L $9,874 by wire transfer for 200 pounds of this powder. After ExxonMobil Canada was delayed in sending the filters for Bench to work on, Miller indicated that Bench could manufacture the filters instead. Dunn signed a change order. Dunn then informed Miller that ExxonMobil Canada needed a different powder for a different emergency job. Miller received another purchase order signed by Dunn. Bench wired B and L $11,356 for 200 pounds of this other powder. Miller put all the Bench employees on the jobs and purchased special equipment and materials. However, the jobs never materialized. A Louis Boullion with B and L sent Miller mill test reports for the powders. However, Bench's testing was unable to determine what specific chemicals comprised the powders, which were "useless" to Bench.

After working as a litigation attorney for Exxon USA, Harry (Bo) Wright opened a welding shop in Oklahoma, Wright Welding and Machine, Inc. Wright received a call from a Harold Lucas regarding a job to coat exchanger heads using "IN6003578" wire from B and L in Tomball. Wright Welding received a purchase

order signed by Lucas and approved by a Joselyn Nelson. Wright communicated with a Louis Boullion and a Norma Williamson with B and L. Wright Welding wired B and L $11,875.20 in full payment upfront for the wire, including $3,000 for expedited shipping. The wire was delayed. In the meantime, Wright attempted to reach the real Harald (not Harold) Lucas and the real Jocelyn (not Joselyn) Nelson and learned that neither Harald nor Jocelyn knew about the purchase order or purported job. Wright unsuccessfully attempted to stop the B and L order. When the wire finally arrived, Wright sent it for lab testing. The wire tested as standard welding wire worth about $2.10 per pound.

After speaking with and receiving an ExxonMobil Canada purchase order signed by a Tony Dunn, Mike Funk with Metal Tech Inc. in Mississippi wired over $23,000 to a Louis Boullion at B and L to purchase proprietary "IN6003578" wire for a pipe-cladding job. However, the wire B and L sent tested "very, very soft." The job never materialized.

Duane Boerboom with Supreme Welding in South Dakota received an email from a Harold Lucas with ExxonMobil Canada about a rush job to clad refinery dome heads. After receiving a purchase order signed by Lucas, Supreme wired $26,621.10 to B and L to purchase the required "IN6003578" wire, plus $2,565 in rush shipping costs. Boerboom heard dogs barking in the background when he spoke to a Louis Boullion with B and L. Supreme received no work from ExxonMobil Canada, ended up laying off four employees, and had to decrease salaries.

Robert (Bob) Ross[1] of Ridge Engineering in Ohio testified that Ridge wired B and L $35,000 to purchase specialized wire

for an ExxonMobil Canada job solicited by a Tony Dunn. Testing revealed that the specialized wire was regular carbon steel wire. The job, which was supposed to entail "hardfacing" tubing, never materialized.

Harold Reimer of Reimer Welding Inc. in Minnesota testified that a Harold Lucas of ExxonMobil Canada solicited Reimer Welding for a job rebuilding tube ends with a wire overlay. After receiving a purchase order signed by Lucas, Reimer Welding wired $9,605.78 to B and L for the special Inconel wire ExxonMobil Canada required for the job. The job never materialized.

Ryan Bourke with Academy Fabricators in Canada received a call from Robert or Bob Long with RLC. Long indicated he had some overflow pipe-cladding work from ExxonMobil that he was unable to handle. Long informed Bourke that for the job Academy was required to use a special powder available only from B and L. Academy wired $78,992 to B and L. Academy received purchase orders from ExxonMobil requiring additional powder. Bourke ordered a second shipment and wired $70,811.20 to B and L. Bourke never received the full 1,600 pounds of powder Academy ordered. Bourke attempted to return the powder for a refund, but never heard back from a Louis Boullion at B and L. The jobs never materialized.

A salesclerk who worked at Cypress–290 Welding Supply testified to selling a man from B and L several spools of regular carbon steel wire, on sale for $1.29 per pound, on January 15, 2009. The man told the clerk he would soon need "close to a pallet" more. The man had two dogs in his SUV. Later, during a TV news report, the

---

1. Ross testified in place of Bernie Schlake, founding owner of Ridge Engineering, who died before trial.

clerk saw the wire he had sold to the man at the man's house. The clerk identified appellant as the purchaser.

Harald Lucas testified that he has worked for ExxonMobil for over 24 years. While working in Baton Rouge, Louisiana, in 2003, Harald met appellant. Harald never knew a Louis Boullion and had no knowledge of B and L. Several times, appellant tried to sell Harald a specialized flame spray process for ExxonMobil. During one call, Harald told appellant he would be moving to northern Canada. Harald learned about the scheme when the payables department at ExxonMobil contacted him about certain welding purchase orders containing the name Harold Lucas. Harald knew nothing about the purchase orders and notified ExxonMobil's legal department and Hank Sarno with ExxonMobil's global security department.

Sarno testified regarding his investigation of the matter. He concluded that no actual ExxonMobil employees—Harald Lucas, Tony Dunn, or Jocelyn Nelson—were involved. Sarno reviewed ExxonMobil records, which led him to a possible connection between Harald Lucas and appellant. Online research of a phone number used in the scheme indicated a general locale of Tomball, Texas. Ultimately, Sarno provided information about his investigation to Sergeant Jeff Lee with the Harris County Constable's High Tech Crimes Division.

Lee, the lead investigator on appellant's case, testified regarding his investigation, which led to the issuance of a search warrant on appellant's Tomball residence. On January 16, 2009, officers executed the warrant and seized multiple electronic devices, including computers, cell phones, air cards,[2] external media storage, and thumb drives; Magic Jacks;[3] corporate documents for B and L showing a Louis Boullion to be the president; mail for B and L addressed to appellant's Tomball residence; a fake Texas driver's license in the name of Louis Boullion containing appellant's Tomball residence address and photo but using appellant's ex-wife Lois Boullion's actual driver's license number; bank check cards in the names of appellant, appellant with B and L, and Louis Boullion with B and L; document scanners; spools and boxes of welding wire;[4] sticker sheets printed with "IN6003578"; B and L business cards with B and L's phone number and listing appellant as the treasurer; envelopes containing approximately $765,720 in cash; and checks on B and L's bank account made out to appellant. No metal powder was located during the search. According to Lee, only appellant lived at the Tomball residence, along with eight dogs.

Lee walked through various digital documents located on appellant's thumb drives.[5] Lee described how appellant's scheme evolved—earlier on, appellant used his own name, and then exclusively started using false names. Lee testified to his conclusion that appellant was the individual using the names Harold Lucas, Tony

2. Lee stated that an air card is "a device that allows mobile Internet access."

3. Lee stated that a Magic Jack is "a device that turns a computer or whatnot into basically something with phone service, voice-over IP type stuff."

4. The boxes were addressed to Dusenbury Engineering in New Jersey.

5. In addition to documents relating to the complainants who testified at trial, the State presented and Lee discussed purchase orders, email correspondence, FedEx air bill labels, B and L invoices, and bills of lading relating to other complainants who did not testify or to their companies, including Bob Fletcher, Brian Robinson, Nancy Moulder, Jon Downie, Ted Wilcox, Ron Politte, Greg Norga, Ed Franger, Sue Kummerle, and Max Rossiter.

Dunn, Joselyn Nelson,[6] Jim Garrison,[7] Louis Boullion, and Norma Williamson.

The State also presented Detective Lawrence Potier, a forensic examiner on special assignment with the FBI at the Regional Computer Forensic Laboratory. Potier analyzed the digital evidence. His analysis revealed documentation related to purchasing hosting for the exxmobcan.com and exxmobca.com domains and email accounts; documentation related to obtaining an email for Louis Boullion at bandlmaterials@aol.com; purchase orders signed by Tony Dunn and Harold Lucas; lists of welding shop email addresses; technical drawings sent to the welding companies; B and L invoices for the specialized wire and powder; FedEx receipts for sending materials in Louis Boullion's name; shipping labels; and email correspondence soliciting the various welding jobs.

Bryan Vaclavik, chief fraud examiner for the Harris County District Attorney's office, performed a forensic examination of the wire transfers and bank accounts involved in the scheme. Vaclavik was able to trace $465,653.58 coming into one of B and L's bank accounts from the complainants listed in appellant's indictment. He was able to trace another $279,918.69 coming into another B and L bank account from the complainants. Appellant owned and had sole access to both accounts. Appellant withdrew money from these accounts through checks written to himself and by wiring money into other bank accounts he controlled. Vaclavik did not locate any payments from any B and L accounts to Louis Boullion, to any employees, or for significant supplies. According to Vaclavik, the B and L account activity reflected "very little to none" in terms of legitimate business.

Appellant testified that he started and owns all the stock in Randall Long Corporation, or RLC. According to appellant, Louis Boullion had lived with him at his Tomball house periodically, and had helped appellant open B and L. Louis was the president and appellant owns all the stock of B and L. Appellant claimed that he had not seen Louis since appellant's arrest. Appellant had no explanation for the fake driver's license located at his Tomball house in the name of Louis Boullion but with appellant's photo. Appellant acknowledged that his ex-wife's name is Lois Boullion.

Appellant denied his involvement in the generation of any purchase orders from ExxonMobil. Appellant claimed Harald Lucas told him that B and L had to sell "IN6003578" wire or ExxonMobil would stop using B and L as a supplier. Appellant also claimed that he would send carbon steel wire along with a powdered metal mix in a kit containing instructions on how to make "IN6003578" wire. He could not explain the fact that no customer who received wire from B and L received any powder to mix with it. According to appellant, no documentation existed regarding the make-up of the "secret process" because "you keep a trade secret secret by keeping it in your head." Appellant also claimed that he was charging customers the "Exxon price." He blamed delayed or missing shipments on "the hurricane." He insisted that no customer ever contacted him to request a refund for any product.

The jury returned a "guilty" verdict. During the punishment phase, among other evidence, the State presented evidence that even after his arrest on this case appellant engaged in additional theft

---

6. Joselyn Nelson was listed as the requisition authority on multiple purchase orders signed by Harold Lucas.

7. Jim Garrison was listed as the requisition authority on multiple purchase orders signed by Tony Dunn and by Harold Lucas.

schemes. This time, the solicitations for welding jobs were on behalf of Chevron Oil and Shell Oil; the specialty wire required was known as "1018TaV"; and the wire was to come from RLC d/b/a Exotic Metals Supply. The jury assessed appellant's punishment at confinement for life. Appellant timely appealed.

## II. ANALYSIS

### A. Appellant's legal-insufficiency issue

In his first issue, appellant challenges the sufficiency of the evidence to support his conviction.

#### 1. Standard of review

In reviewing legal sufficiency, we view all of the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). "This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015), *cert. denied*, —— U.S. ——, 136 S.Ct. 198, 193 L.Ed.2d 127 (2015). We consider direct and circumstantial, as well as properly and improperly admitted, evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence and alone may be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Terry v. State*, 397 S.W.3d 823, 830 (Tex. App.–Houston [14th Dist.] 2013, pet. ref'd). Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13.

The State is not required to disprove every conceivable alternative to a defendant's guilt. *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). When the record supports conflicting inferences, appellate courts presume the factfinder resolved the conflicts in favor of the verdict, and defer to that determination. *Murray*, 457 S.W.3d at 449.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Perez v. State*, 495 S.W.3d 374, 381 (Tex. App.–Houston [14th Dist.] 2016, no pet.). The hypothetically correct jury charge is one that accurately sets forth the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict its theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240.

#### 2. Law concerning aggregated theft

■ Theft is committed when a person "unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code § 31.03(a) (West 2015). "Appropriate" means "to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4)(B) (West 2015). Appropriation of property is unlawful if it is "without the owner's effective consent." *Id.* § 31.03(b)(1). Consent is not effective if "induced by deception or coercion." *Id.* § 31.01(3)(A). "Deception" means "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true." *Id.* § 31.01(1)(A). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct

when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2015). Intent is a question of fact for the jury and may be inferred from the circumstances. *See Terry*, 397 S.W.3d at 829; *Reed v. State*, 158 S.W.3d 44, 48 (Tex. App.–Houston [14th Dist.] 2005, pet. ref'd). "Deprive" means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." Tex. Penal Code § 31.01(2)(A). An "owner" "has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor." *Id.* § 1.07(a)(35)(A) (West 2015). "Property" means "a document, including money, that represents or embodies anything of value." *Id.* § 31.01(5)(B), (C).

█ The Texas Penal Code allows multiple thefts committed pursuant to one scheme or continuing course of conduct—even at different times and against different victims—to aggregate within one offense for the purpose of determining the grade of the offense. *Terry*, 397 S.W.3d at 829–30; *see* Tex. Penal Code § 31.09 ("When amounts are obtained in violation of this chapter [31 Theft] pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense."). Aggregation under section 31.09 creates a single offense for purposes of severance, jurisdiction, punishment, limitations, and venue. *Kent v. State*, 483 S.W.3d 557, 561–62 (Tex. Crim. App. 2016); *see Terry*, 397 S.W.3d at 830. "Each individual theft and its elements aggregated under Section 31.09 is an element of the single offense created by Section 31.09." *Kent*, 483 S.W.3d at 561–62 (citing *State v. Weaver*,

982 S.W.2d 892, 893 (Tex. Crim. App. 1998)); *Terry*, 397 S.W.3d at 830. When a defendant is charged with theft in an aggregated amount pursuant to one scheme or continuing course of conduct, the State is not required to prove each individual appropriation. *Kent*, 483 S.W.3d at 561. The evidence will be sufficient if the State proves that the defendant "illegally appropriated enough property to meet the aggregated value alleged." *Id.*

█ Recently, the Court of Criminal Appeals considered whether a proper aggregated theft jury charge must include "language that required jury-unanimity for each individual theft that was included within the alleged aggregation of thefts pursuant to one scheme or continuing course of conduct." *Id.* at 560. The *Kent* Court construed the text of section 31.09 and concluded that it "shows a legislative intent to treat the 'scheme or continuing course of conduct' as the culpable criminal behavior rather than each individual theft used to prove the scheme or course of conduct." *Id.* at 561. The *Kent* Court held that "unanimity requires that the jurors agree that the threshold amount has been reached and that all the elements are proven for each instance of theft that the individual juror believes to have occurred." *Id.* at 562. "As long as the jury unanimously agrees that the proven thefts that comprise the elements of aggravated-theft exceed the threshold amount and the thefts are proven beyond a reasonable doubt, regardless of which transactions each juror believes to have occurred, the aggregated-theft is proved." *Id.*

### 3. The evidence was sufficient to support appellant's conviction.

The abstract portion of appellant's jury charge provided the elements of theft and pertinent statutory definitions. The charge generally tracked the statutory language from section 31.09. *See* Tex. Penal Code

§ 31.09; *Kent*, 483 S.W.3d at 560. The application paragraph of the charge tracked appellant's indictment and provided:

Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, the defendant, Robert Randall Long, heretofore on or about March 01, 2008 and continuing through January 31, 2009, did then and there unlawfully, pursuant to one scheme or continuing course of conduct, appropriate, by acquiring or otherwise exercise control over property, namely, money, owned by Matt Berkebill, with the intent to deprive Matt Berkebill of said property, money owned by Doug Barber or Manny Camarena, with the intent to deprive Doug Barber or Manny Camarena of said property, money owned by Harold Reimer, with the intent to deprive Harold Reimer of said property, money owned by Bernard Schlake, with the intent to deprive Bernard Schlake of said property, money owned by Duane Boerboom, with the intent to deprive Duane Boerboom of said property, money owned by Harry Wright, with the intent to deprive Harry Wright of said property, money owned by Bob Fletcher, with the intent to deprive Bob Fletcher of said property, money owned by Brian Robinson, with the intent to deprive Brian Robinson of said property, money owned by Brian Miller or Bench Industries, with the intent to deprive Brian Miller or Bench Industries of said property, money owned by Nancy Moulder, with the intent to deprive Nancy Moulder of said property, money owned by Scott Morgan, with the intent to deprive Scott Morgan of said property, money owned by Joe Downie, with the intent to deprive Joe Downie of said property, money owned by Bob Dawson, with the intent to deprive Bob Dawson of said property, money owned by Martin Bruner, with the intent to deprive Martin Bruner of said property, money owned by Jose Rodriguez, with the intent to deprive Jose Rodriguez of said property, money owned by Dusenbury Engineering, with the intent to deprive Dusenbury Engineering of said property, money owned by Ted Wilcox, with the intent to deprive Ted Wilcox of said property, money owned by Dave Austin, with the intent to deprive Dave Austin of said property, money owned by Mike Funk, with the intent to deprive Mike Funk of said property, money owned by Ron Politte or Robert Peck, with the intent to deprive Ron Politte or Robert Peck of said property, money owned by Joe Orlowski, with the intent to deprive Joe Orlowski of said property, money owned by Scott Allen, with the intent to deprive Scott Allen of said property, money owned by Brian Morin, with the intent to deprive Brian Morin of said property, money owned by Greg Norga, with the intent to deprive Greg Norga of said property, money owned by Mark Kartsonis, with the intent to deprive Mark Kartsonis of said property, money owned by Ed Franger, with the intent to deprive Ed Franger of said property, money owned by Morgan Bullock, with the intent to deprive Morgan Bullock of said property, money owned by Jim Sikkema, with the intent to deprive Jim Sikkema of said property, money owned by Sue Kummerle, with the intent to deprive Sue Kummerle of said property, money owned by Edwin Arnicans, with the intent to deprive Edwin Arnicans of said property, money owned by Ryan Bourke, with the intent to deprive Ryan Bourke of said property, money owned by Max Rossiter, with the intent to deprive Max Rossiter of said property, and the total value of the property appropriated from the above persons was over

two hundred thousand dollars, then you will find the defendant guilty of theft of property of the total value of over two hundred thousand dollars, as charged in the indictment.

The charge further instructed the jury that all persons are presumed innocent, that the State has the burden to prove each of the elements of the offense beyond a reasonable doubt, and that the jury's verdict had to be unanimous. The jury found appellant "guilty."

■ In his first issue, appellant argues the circumstantial evidence in this case failed to establish beyond a reasonable doubt that "he personally committed theft in an amount over $200,000 pursuant to one continuing scheme or course of conduct." He contends that the evidence merely "suggested his involvement perhaps as a party." We disagree.

First, the evidence reflects appellant's personal involvement in the scheme under his own name, Robert Long. Both Miller with Bench and Bourke with Academy testified that they had dealings with Robert or Bob Long or RLC in order to procure "proprietary" specialized powders for supposed ExxonMobil welding jobs.[8] Appellant acknowledged that RLC was his company.

Moreover, the evidence reflects appellant's personal involvement in the scheme under various false names. Appellant contends that the only evidence of his using any false name was the existence of the Louis Boullion driver's license using appellant's photo. However, the record reflects circumstantial evidence connecting appellant with not only the name of Louis Boullion, but also with the names of Harold Lucas, Tony Dunn, Joselyn Nelson, Jim Garrison, and Norma Williamson.

■ In addition to the fake Louis Boullion driver's license, appellant possessed a check card in Louis Boullion's name. Also located in appellant's house was digital evidence of purchase orders signed by Tony Dunn and Harold Lucas, and containing the names of Joselyn Nelson and Jim Garrison. Lee opined that the signature of Harold Lucas was consistent with appellant's handwriting. *See Denham v. State*, 574 S.W.2d 129, 131 (Tex. Crim. App. 1978) (lay opinions concerning handwriting are permissible). Appellant had in his possession documentation related to domain name and email account set-up for exxmobcan.com and exxmobca.com, and to email account set-up for B and L. Email correspondence to and from these various addresses was linked to not only Louis Boullion, but also to Harold Lucas, Tony Dunn, Jim Garrison, and Norma Williamson. The cell phone associated with the number for B and L, and used to call multiple victims, was located in appellant's possession. Appellant possessed Magic Jack devices with phone numbers associated with the ExxonMobil Canada numbers for Tony Dunn, Harold Lucas, and Jim Garrison. There was evidence that appellant was the only individual living at the Tomball residence. There was evidence that B and L's banking activity did not appear to be that of a legitimate business enterprise. There was evidence that no actual ExxonMobil employees were involved in the scheme. The jury was free to determine the credibility of the witnesses and choose whose testimony it believed. *See Laster*, 275 S.W.3d at 517. We conclude the jury reasonably could infer that

---

8. The evidence reflected that appellant received over $171,000 just from Bench and Academy. In addition, the evidence reflected that appellant received an additional $149,000 from the other complainants who testified. Vaclavik traced approximately $745,000 coming into appellant's accounts from all complainants.

the other names of individuals involved in the scheme were false names utilized by appellant and that appellant was the only actual person involved.[9]

■ Finally, appellant argues that no complainant identified him in court and no one ever saw him sign or send any documents to the complainants. Appellant does not provide, and we have not located, any authority requiring that complainants interact with an accused thief face-to-face. Rather, "[e]vidence as to the identity of a thief can be proven by direct or circumstantial evidence." *Oliver v. State*, 613 S.W.2d 270, 274 (Tex. Crim. App. 1979). Lack of in-person contact is entirely consistent with a fraudulent scheme designed for the most part to happen online and, when necessary, by phone. At least one complainant, Funk, tried to set up a meeting with Tony Dunn during a business trip to Houston and was unsuccessful. Appellant also does not provide, and we have not located, any authority requiring that anyone directly witness an accused thief's signing documents or sending them to complainants. Any such failures to identify appellant at trial go to the weight and credibility of the witnesses and were before the jury for its consideration. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986).

Having reviewed the trial evidence, as detailed above, in the light most favorable to the verdict, a reasonable jury could have found beyond a reasonable doubt that, pursuant to one scheme or continuing course of conduct, appellant unlawfully appropriated the complainants' property with the intent to deprive them of such property, and that the total value of such aggregated theft was over $200,000. *See* Tex. Penal Code §§ 31.03, 31.09; *Kent*, 483 S.W.3d at 562. Therefore, we overrule appellant's first issue.

## B. Appellant's jury-charge issue

The Code of Criminal Procedure provides that the trial court shall provide the jury with "a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." Tex. Code Crim. Proc. art. 36.14 (West 2015).

■ We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). We first determine if error exists, then, if so, whether harm warrants reversal. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the error was preserved in the trial court. *Id.* Because appellant did not object to the potential error, we only reverse if he suffered egregious harm. *See id.* at 743–44. "Errors resulting in egregious harm are those which affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defense theory." *Hudson v. State*, 179 S.W.3d 731, 740 (Tex. App.–Houston [14th Dist.] 2005, no

9.  Within the concluding sentence of his insufficiency issue, appellant appears to complain of "the lack of a parties charge in the jury instructions." Any jury-charge argument is not adequately briefed. *See* Tex. R. App. P. 38.1(i). Further, even if appellant had objected to the lack of a parties charge, which he did not, such charge is not required when the defendant is accused of having committed the offense himself and there is evidence that the defendant took at least an equal part in the offense. *See Reyes v. State*, 741 S.W.2d 414, 424 (Tex. Crim. App. 1987); *Williams v. State*, 676 S.W.2d 399, 402 (Tex. Crim. App. 1984). Here, the evidence was sufficient to establish appellant's guilt as the primary actor.

pet.) (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). We consider harm in light of the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, counsel's arguments, and any other relevant information revealed by the trial record as a whole. *Almanza*, 686 S.W.2d at 171.

■ In his second issue, appellant contends that the trial court erred by including the following "circumstantial evidence" instruction in the jury charge:

> In trials involving an allegation of a continuing scheme of fraud or theft alleged to have been committed against a large class of victims in an aggregate amount or value, it need not be proved by direct evidence that each alleged victim did not consent or did not effectively consent to the transaction in question. It shall be sufficient if the lack of consent or effective consent to a particular transaction or transactions is proven by either direct or circumstantial evidence.

Appellant argues that the instruction was valueless, confusing, and constituted an improper comment on the weight of the evidence. Appellant relies on *Hankins v. State*, 646 S.W.2d 191 (Tex. Crim. App. 1981).

*Hankins* does not support a finding of error. Before *Hankins*, in a circumstantial-evidence case, the defendant was entitled to an instruction explaining to the jury that it was to convict only if the evidence "excluded to a moral certainty" every other reasonable hypothesis except the defendant's guilt. *Hankins* abolished such requirement:

> [T]here is but one standard of proof for criminal convictions and where the jury is properly instructed on that standard, a charge on circumstantial evidence is valueless and invites confusion.... Rather than aiding jurors in applying

the reasonable doubt standard, an additional charge on circumstantial evidence focusing on the "reasonable hypothesis" theory serves only to distract jurors from examining the proper standard of proof as the primary focus of their deliberations.

646 S.W.2d at 199. The Court of Criminal Appeals later altogether rejected use of this analytical construct—the exclusion of outstanding reasonable hypotheses of innocence—as a method of appellate review for evidentiary sufficiency. *Geesa v. State*, 820 S.W.2d 154, 159–61 (Tex. Crim. App. 1991), *overruled in part by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000) (overruling that portion of *Geesa* requiring an instruction in the jury charge on the definition of "beyond a reasonable doubt").

■ The challenged instruction here was not the "reasonable hypothesis" one requested and rejected in *Hankins*. Nor was it based on the "reasonable hypothesis" analytical construct rejected in *Geesa*. Instead, the given instruction correctly sets out the law. Although the law at one time required lack of consent to be proven by direct testimonial evidence of the victim unless that evidence was not available, since 1974 the law has permitted the State to prove the owner's lack of consent by either direct or circumstantial evidence. *See Hathorn v. State*, 848 S.W.2d 101, 107 (Tex. Crim. App. 1992); *Taylor v. State*, 508 S.W.2d 393, 394–97 (Tex. Crim. App. 1974). Moreover, the language of the instruction at issue is based on and tracks article 38.39 of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.39 (West 2015) ("In trials involving an allegation of a continuing scheme of fraud or theft alleged to have been committed against a large class of victims in an aggregate amount or value, it need not be proved by direct evidence that each alleged victim did not consent or did not

effectively consent to the transaction in question. It shall be sufficient if the lack of consent or effective consent to a particular transaction or transactions is proven by either direct or circumstantial evidence.").[10]

Appellant also relies on *Robert v. State*, 672 S.W.2d 570 (Tex. App.–Fort Worth 1984, no pet.). *Roberts* is distinguishable. There, the complained-of jury instruction provided: "A presumption of a defendant's guilt of a burglary sufficient to sustain a conviction may arise from a defendant's possession of property stolen or taken in a recent burglary. However, in the prosecution for burglary, to warrant such an inference or presumption of guilt from the circumstances of possession alone, such possession must be personal, must be recent, must be unexplained, and must involve a distinct and conscious assertion of right to the property by a defendant." *Id.* at 577–78. Unlike the erroneous instruction in *Roberts*, the instruction here did not single out, much less provide that a presumption or inference of guilt may arise based on, circumstantial evidence. Nor did the instruction comment on the weight of any particular fact or type of fact. *Cf. id.* at 578. The instruction did not express any preference for any type of evidence or fact in assessing the lack of consent or effective consent in continuing scheme trials.

Finally, appellant, in passing and without further explanation, takes issue with the phrase "large class of victims" in the instruction. Article 38.39 employs this exact phrase. *See* Tex. Code Crim. Proc. art. 38.39. Moreover, nothing within this instruction eliminates or otherwise lessens the State's burden to prove lack of consent or effective consent, whether by direct or circumstantial evidence, as to "each alleged victim" for each particular transaction in order to reach the aggregate amount at issue. *See id.*

In sum, the trial court did not err by including this instruction. We need not determine whether any egregious harm resulted. We overrule appellant's second issue.

## C. Appellant's motion-to-suppress issues

In his third and fourth issues, appellant challenges the trial court's denial of his motion to suppress evidence obtained: (1) pursuant to the search warrant issued January 15, 2009; and (2) pursuant to his written consent on October 1, 2009.

In reviewing the trial court's ruling on the motion to suppress, we apply a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give almost total deference to the trial court's determination of historical facts that depend on credibility, while we conduct a de novo review of the trial court's application of the law of search and seizure and probable cause to those facts. *Id.* "Appellate review of an affidavit in support of a search warrant, however, is not de novo." *Blake v. State*, 125 S.W.3d 717, 722 (Tex. App.–Houston [1st Dist.] 2003, no pet.). Rather, great deference is given to the magistrate's de-

**10.** Article 38.39 was added in 2001. *See* Act of May 26, 2001, 77th Leg., R.S., ch. 1411, § 2, 2001 Tex. Gen. Laws 3633 (codified at Tex. Code Crim. Proc. art. 38.39). Only one other Texas appellate court has considered article 38.39, concluding in an unpublished opinion that including an article 38.39 instruction in the jury charge was not error. *See Hudson v.* *State*, No. 05-14-00224-CR, 2015 WL 1313984, at *4–5 (Tex. App.–Dallas Mar. 20, 2015, no pet.) (mem. op., not designated for publication). We are aware of no authority addressing whether such an instruction must be given in aggregated theft cases, and we express no opinion on that question.

termination of probable cause. *See Illinois v. Gates*, 462 U.S. 213, 236–37, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Swearingen v. State*, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004); *Blake*, 125 S.W.3d at 722; *Thacker v. State*, 889 S.W.2d 380, 387 (Tex. App.–Houston [14th Dist.] 1994, pet. ref'd).

The core of the Fourth Amendment's warrant clause and article I, section 9, of the Texas Constitution is that a magistrate may not issue a search warrant without first finding probable cause that a particular item will be found in a particular location. *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012); *see* U.S. Const. amend. IV; Tex. Const. art. I, § 9. A reviewing court's assessment of the affidavit's sufficiency is limited to "a reasonable reading" within the four corners of the affidavit while simultaneously recognizing the magistrate's discretion to draw reasonable inferences. *See Duarte*, 389 S.W.3d at 354 (citing *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007)). Probable cause exists when, under the totality of the circumstances, there is a "fair probability" that contraband or evidence of a crime will be found at the specified location. *Id.* (citing *Gates*, 462 U.S. at 238, 103 S.Ct. 2317). We review the supporting affidavit realistically and with common sense; "a reviewing court must uphold the magistrate's decision so long as the magistrate had a substantial basis for concluding that probable cause existed." *Id.* Our focus cannot be on what other facts "could or should have been included in the affidavit," but rather must be "on the combined logical force of facts that actually are in the affidavit." *Id.* at 354–55.

The affiant's reliability, as well as the reliability of his sources, are part of the totality of the circumstances that the magistrate should evaluate in making a probable-cause determination. *See id.* at 357 ("Citizen informants are considered inherently reliable; confidential informants are not."); *Johnson v. State*, 803 S.W.2d 272, 289 (Tex. Crim. App. 1990) ("The magistrate may rely on the affidavit of a police officer based on his knowledge or the knowledge of other officers."), *overruled in part by Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991); *State v. Coker*, 406 S.W.3d 392, 396 (Tex. App.–Dallas 2013, pet. ref'd) (magistrate is "entitled to rely on information supplied by a private citizen since, unlike many police informants, they are much less likely to produce false or untrustworthy information").

The focus of appellant's third issue is the probable-cause affidavit supporting the January 2009 search warrant. Therefore, our task is to ascertain whether a reasonable reading of the affidavit would lead the magistrate to the conclusion that the four corners of the affidavit provided a substantial basis for issuing a search warrant. We conclude that it would.

The January 2009 search warrant was supported by Sergeant Lee's eight-page affidavit. Lee averred that Sarno contacted Lee about Sarno's investigation of the alleged confidence scheme and provided Lee with contact information for the affected companies. Lee spoke with Berkebill with Advanced, Doug Barber with Barber Welding, Bill Thomas of Cotterman, Inc.,[11] Reimer with Reimer Welding, Bernie Schlake with Ridge, Boerboom with Supreme, and Wright with Wright Welding. The companies provided Lee with documents. Lee used the information and documents received from the victim companies in his investigation. Lee performed an on-

---

11. At trial, the State moved to, and the trial court agreed to, abandon the indictment language regarding Thomas because the word "intent" was missing.

line investigation of phone numbers used in the scheme, which led him to appellant. Law enforcement databases revealed information about appellant's address, birth date, and driver's license. Lee sent a subpoena to the carrier for the phone number associated with B and L. These records identified appellant as the subscriber and confirmed calls with the victim companies. Lee also investigated business addresses provided for B and L, which turned out to be false. Lee drove by appellant's gated community and noted that a Lois Boullion was also listed at the call box for that address. An Accurint report on appellant showed a possible ex-wife with that name. Lee subpoenaed banking records, which identified appellant as the account holder, included corporate information about B and L and Louis Boullion, and confirmed wire transfers from the victim companies and payments to appellant. Lee investigated the domain names and email addresses used by the suspect and subpoenaed information from an email hosting firm. These records identified Louis Boullion using appellant's address as the registrant. Lee traced the payment to a Visa credit card account for B and L opened by appellant. Lee used IP addresses to confirm that appellant was the carrier account holder using particular email addresses at the dates and times the victim companies were contacted. Based on his investigation, Lee believed that evidence of felony aggregated theft would be located on appellant's property.

Appellant takes issue with Lee's affidavit because he "took the word of disgruntled companies at face value and failed to inspect the wire himself or make any attempt to corroborate that in fact the various companies received nonconforming wire." Appellant does not provide, and we have not located, any authority holding that an investigating officer cannot rely on statements from victims or needs any addi-tional corroborating evidence. Here, Lee spoke to seven named individual victims of the scheme and reviewed various documents supporting their statements. Aside from characterizing these individuals as "disgruntled," appellant does not explain why the magistrate would not be able to rely on information supplied by identified private citizens located in different states who all provided details of a very similar scheme. *See Duarte*, 389 S.W.3d at 357; *Coker*, 406 S.W.3d at 396. Appellant also does not explain why the magistrate would not be able to rely on the knowledge obtained by Lee during his police investigation. *See Johnson*, 803 S.W.2d at 289.

Appellant characterizes Lee's affidavit "regarding the welding wire in controversy" as "conclusory." However, Lee did not just provide "bare conclusions." *See Gates*, 462 U.S. at 239, 103 S.Ct. 2317. Instead, Lee outlined underlying details provided by the victims regarding the required Inconel "IN6003578" wire, including that it was specially developed, not easy to find, in stock at B and L, and available for $53 per pound. Lee also described how, after receipt by the victims, the wire "is determined to be any number of standard gauge welding wire" at a wholesale cost of $1.00 per pound and how the victims then are unable to contact B and L.

Appellant also complains that no additional documents were attached to the affidavit "so that the magistrate could make an independent decision regarding whether a crime had occurred versus relying solely on the affiant's conclusory statements." Again, we do not view Lee's statements as conclusory. Moreover, appellant does not provide, and we have not located any authority requiring attachment of underlying documents to a search-warrant affidavit in order for the magistrate to determine the existence of probable cause. Here, within the "four corners" of his affi-

davit, Lee indicated what types of documents were provided by the victims, such as emails, wire transfers, bank records, invoices, and purchase orders, and described how he used these documents to further his investigation of appellant.

We conclude, from the four corners of Lee's affidavit and based on the totality of the circumstances, the magistrate had a substantial basis to find probable cause that evidence of aggregated theft would be found at appellant's property. Therefore, probable cause existed to search appellant's residence on January 16, 2009. The trial court did not err in denying appellant's motion to suppress the evidence from this search. We overrule appellant's third issue.

■ In appellant's fourth issue, he challenges the trial court's denial of the motion to suppress with regard to evidence obtained pursuant to appellant's written consent to search his Tomball residence on October 1, 2009. Appellant argues that his consent was invalid and that any consent did not carry over to the next day when officers searched an RV and trailer removed from appellant's residence.

Having reviewed the record to compare the descriptions of the items seized in October 2009 with the trial exhibits, the record does not reflect that any of the items seized in October 2009 was offered or admitted at trial.

Therefore, we overrule appellant's fourth issue as moot. See *Gonzalez v. State*, 296 S.W.3d 620, 633 (Tex. App.–El Paso 2009, pet. ref'd) (complaints regarding written confession and oral statements were moot when record did not reflect they were admitted as trial evidence).

## D. Appellant's self-representation issue

Initially, in January 2012 after a hearing pursuant to *Faretta v. California*, 422 U.S.

806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the trial court permitted appellant to represent himself. In April 2013, after appellant was delayed for a motions hearing after becoming combative with Harris County Sheriff's personnel, the trial court ordered a psychiatric examination to ensure appellant's ability to continue representing himself. The trial court held another *Faretta* hearing in June 2013. At the hearing, appellant described himself as having numerous "untreated disabilities," including cervical and lumbar spine damage, rotator cuff damage, impaired hearing, and impaired ability to write. The trial court cautioned appellant that if he elected to proceed pro se he would need to comply with the rules of evidence and procedure, and would have to maintain courtroom decorum and not be disruptive. The trial court permitted appellant to continue representing himself. At the next motions hearing a few days later, the trial court noted previous delays due to appellant's "illnesses and disabilities." At this hearing, appellant also stated that he had difficulties providing a complete list of what motions he wanted heard because "[his] life was threatened." The list appellant provided to the trial court included "two verbose paragraphs regarding threats, the FBI, the Texas Rangers, the sheriff's department."

At the final pre-trial motions hearing in August 2013, at which six attorneys were present to argue their motions to quash appellant's numerous subpoenas, appellant informed the trial court that he had "received some blows to the head, was knocked unconscious and had some head trauma." Appellant mentioned at least two jail assaults and stated that he "was having problems with memory loss, blackouts, dizziness, other issues." Appellant indicated having "a lot of trouble with memory" and did not "feel confident enough to

do anything from a legal standpoint until [he] receive[d] some sort of treatment from the infirmary for whatever is going on." Appellant reported taking pain medication and steroids. The trial court informed appellant that he needed to determine whether appellant was competent and whether he could continue to represent himself. The next day, after reviewing appellant's medical records, the trial court noted that appellant was "on some pretty heavy opiates" and ordered psychiatric and medical examinations.

■ At a hearing in December 2013, the trial court revisited the *Faretta* issue. Appellant informed the trial court that he was "memory-wise probably about 95 percent back up to capacity again." The trial court expressed concern with appellant's recollection not being 100 percent, with his multiple letters to the trial court reflecting "some sort of obsession with the Aryan Brotherhood," and with the deteriorating "form and fashion" of appellant's legal filings. The trial court ruled that appellant could no longer represent himself and ordered standby counsel to step in as appellant's counsel. Appellant continued to object and interrupt the proceedings.

■ Since competence to proceed pro se is a mixed question of law and fact that turns on an evaluation of credibility and demeanor, we review the trial court's ruling for an abuse of discretion. *Chadwick v. State*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010). We afford "almost total deference" to such a ruling because "the trial judge is in the best position to make the decision of whether a mentally ill defendant is competent to proceed pro se." *Id.* We view the evidence in the light most favorable to the trial judge's ruling, and in the absence of explicit findings of fact imply any findings supported by the evidence and necessary to support the trial court's ruling. *Id.*

In *Indiana v. Edwards*, the United State Supreme Court considered whether the federal Constitution requires a state judge to allow a mentally ill defendant, upon request, to proceed pro se. 554 U.S. 164, 169, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008). "Ultimately, the Court recognized a 'mental-illness-related limitation on the scope of the self-representation right.'" *Chadwick*, 309 S.W.3d at 561 (quoting *Edwards*, 554 U.S. at 171, 128 S.Ct. 2379). The Court held:

> [T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States*, 36[2] U.S. 402[, 80 S.Ct. 788, 4 L.Ed.2d 824] (1960),] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

*Edwards*, 554 U.S. at 177–78, 128 S.Ct. 2379. "In reaching this conclusion, the Court took into account the erratic character of mental illness and determined that 'the trial judge ... will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.'" *Chadwick*, 309 S.W.3d at 561 (quoting *Edwards*, 554 U.S. at 177, 128 S.Ct. 2379).

■ In appellant's fifth issue, he asserts that the trial court abused its discretion when it refused to allow him to continue representing himself. Appellant primarily takes issue with the trial court's reliance on *Edwards* because there was no evidence that appellant had a mental

illness. We do not agree with appellant that the trial court misapplied *Edwards*. The *Edwards* Court made clear that under the Constitution trial judges are permitted to take a realistic account of the particular defendant's mental capacities in deciding whether a defendant who seeks to conduct his own defense is mentally competent to do so. *Fletcher v. State*, 474 S.W.3d 389, 400 (Tex. App.–Houston [14th Dist.] 2015, pet. ref'd) (citing *Edwards*, 554 U.S. at 177–78, 128 S.Ct. 2379). The *Edwards* Court also indicated that the trial court is in the best position to make the determination of whether a defendant can "carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 410 (citing *Edwards*, 554 U.S. at 175–76, 128 S.Ct. 2379).

██ Here, regardless of appellant's competence to stand trial, the trial court expressed concern with appellant's mental competency to represent himself. Even appellant acknowledged that he did not consider himself at full mental capacity. The trial court expressed concern with appellant's multiple letters obsessing over activities of the Aryan Brotherhood. Appellant reported feeling "threatened" by various law enforcement organizations. Appellant stated his belief that the physical assaults against him were "sponsored" by "individuals within the State prosecutorial structure." Appellant's September 2013 psychiatric report noted "delusional [] symptoms" related to "many accus[]ations and litigation by the patient." In addition, the trial court expressed concern with appellant's declining ability to file legible and coherent legal documents—certainly, "basic tasks" in any defense.

Moreover, at multiple points during the pre-trial proceedings, appellant refused to comply with the trial court's directives, including with regard to subpoenas, ex parte communications, and motions. The trial court noted appellant's history of delay for almost four years and his courtroom "outbursts." The trial court indicated that "some of Mr. Long's own actions are beginning to, I believe, now weigh against him in delaying the proceedings" and posed an "unfair burden to the State." This court has held that a trial court does not abuse its discretion in denying a defendant's ability to represent himself where the defendant's behavior "demonstrated an attempt at calculated obstruction and delay, not an earnest attempt to act in his own defense" and where the defendant exhibited "deliberate and calculated disruptions." *Lewis v. State*, —— S.W.3d ——, —— – ——, No. 14-14-00779-CR, 2016 WL 93760, at *5–6 (Tex. App.–Houston [14th Dist.] Jan. 7, 2016, pet. ref'd).

On this record, we conclude that the trial court did not abuse its discretion in denying appellant's self-representation at trial. We overrule appellant's fifth issue.

### III. Conclusion

Having overruled all five of appellant's issues, we affirm the trial court's judgment.